# IN THE SUPREME COURT OF TEXAS

═══════════

No. 16-0505

═══════════

MURPHY EXPLORATION & PRODUCTION COMPANY—USA,
A DELAWARE CORPORATION, PETITIONER,

v.

SHIRLEY ADAMS, CHARLENE BURGESS, WILLIE MAE HERBST JASIK,
WILLIAM ALBERT HERBST, HELEN HERBST, AND
R. MAY OIL & GAS COMPANY, LTD., RESPONDENTS

═══════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

═══════════

**Argued December 5, 2017**

JUSTICE LEHRMANN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE DEVINE, JUSTICE BROWN, and JUSTICE BLACKLOCK joined.

JUSTICE JOHNSON filed a dissenting opinion, in which JUSTICE GREEN, JUSTICE GUZMAN, and JUSTICE BOYD joined.

This action stems from a contract dispute over an offset provision in an oil and gas lease. The court of appeals held that the lessee did not conclusively demonstrate compliance with the provision and reversed the trial court's summary judgment in the lessee's favor. Because the court of appeals read a requirement into the lease that its unambiguous language does not support, we reverse the court's judgment.

# I. Background

Shirley Mae Herbst Adams and William Albert Herbst entered into essentially identical oil and gas leases with Murphy Exploration & Production Company's predecessor-in-interest. The leases cover two contiguous 302-acre tracts in Atascosa County. The leases each contain a provision obligating Murphy to either drill an offset well, pay royalties, or release acreage in the event a producing well is completed on an adjacent tract within 467 feet of the leased tracts. In its entirety, the offset provision states:

> It is hereby specifically agreed and stipulated that in the event a well is completed as a producer of oil and/or gas on land adjacent and contiguous to the leased premises, and within 467 feet of the premises covered by this lease, that Lessee herein is hereby obligated to, within 120 days after the completion date of the well or wells on the adjacent acreage, as follows:
>
>> (1) to commence drilling operations on the leased acreage and thereafter continue the drilling of such off-set well or wells with due diligence to a depth adequate to test the same formation from which the well or wells are producing from [sic] on the adjacent acreage; or
>>
>> (2) pay the Lessor royalties as provided for in this lease as if an equivalent amount of production of oil and/or gas were being obtained from the off-set location on these leased premises as that which is being produced from the adjacent well or wells; or
>>
>> (3) release an amount of acreage sufficient to constitute a spacing unit equivalent in size to the spacing unit that would be allocated under this lease to such well or wells on the adjacent lands, as to the zones or strata producing in such adjacent well.

Comstock Oil & Gas, LP drilled a producing horizontal well (the Lucas well) on the tract adjacent to and southwest of the tracts covered by the leases. The Lucas well, which was landed in the Eagle Ford Shale formation, is 350 feet from the lease boundary and thus triggered the offset provision. Rather than pay royalties based on the Lucas well's production or release acreage, Murphy chose to exercise the provision's first option and commenced drilling

operations. Specifically, within 120 days of the Lucas well's completion date, Murphy commenced drilling a horizontal well (the Herbst well) on the leased acreage. It is undisputed that the Herbst well was also landed in the Eagle Ford Shale formation and was thus drilled "to a depth adequate to test the same formation" from which the Lucas well was producing. However, the Herbst well is approximately 1,800 feet from the pertinent lease line. The horizontal laterals of both wells run parallel to the lease line.

Murphy completed the Herbst well in November 2012 and began paying royalties on production. Six months later, the lessors and royalty owners under the leases (collectively, Herbst) sued Murphy for breach of contract, alleging that Murphy failed to comply with the offset provision.[1] Murphy counterclaimed, seeking declaratory relief regarding its obligations under and compliance with the leases. The parties filed cross-motions for partial summary judgment. Herbst argued that the Herbst well is too far from the lease boundary to qualify as an offset well, in light of both the common meaning of the term "offset" and the oil and gas industry's understanding of the term "offset well" as a well intended to protect against drainage. Murphy asserted that the provision imposes no location or minimum spacing requirement for the offset well; it requires only that the well be drilled "on the leased acreage" and "to a depth adequate to test the same formation from which the well or wells are producing from [sic] on the adjacent acreage." Murphy thus argued that this provision, "drafted with horizontal shale wells in mind, only require[s] the lessee to counterbalance (or offset) production from the tight shale formation, recognizing that there is little to no drainage in the Eagle Ford shale, and therefore no reason to locate the offset well near the lease line."

---

[1] In addition to lessors Shirley Adams and William Herbst, the plaintiffs included Charlene Burgess, Willie Mae Herbst Jasik, Helen Herbst, and R. May Oil & Gas Company, LTD.

The trial court granted Murphy's motion, denied Herbst's, and rendered a final judgment granting Murphy declaratory relief and awarding Murphy costs and conditional appellate attorney's fees, but no trial court fees. Herbst appealed, challenging both the summary judgment and the award of attorney's fees. The court of appeals reversed and remanded, holding that Murphy did not conclusively prove that it complied with the offset provision and thus was not entitled to summary judgment. 497 S.W.3d 510, 511 (Tex. App.—San Antonio 2016). The court did not reach the merits of Herbst's independent challenges to the fee award. *Id.* at 517. We granted Murphy's petition for review.[2] In this Court, Murphy affirmatively waives its claim to conditional appellate attorney's fees.

## II. Discussion

### A. Standard of Review

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Summary judgment is appropriate when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law on the issues presented. TEX. R. CIV. P. 166a(c). A defendant may obtain summary judgment by, among other things, conclusively negating at least one element of the plaintiff's cause of action. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). In reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Valence Operating Co.*, 164 S.W.3d at 661.

---

[2] Texas Land & Mineral Owners Association and Chesapeake Eagle Ford MDL Royalty Owners submitted amicus briefs in support of Herbst, while the Texas Oil and Gas Association submitted an amicus brief in support of Murphy.

In this breach-of-contract case, Murphy's compliance with the leases, or lack thereof, hinges on the proper interpretation of those leases. In construing an oil and gas lease, as with any contract, our task is to "ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). This analysis begins with the contract's express language. *Id.* We "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Seagull Energy E & P, Inc. v. Eland Energy*, 207 S.W.3d 342, 345 (Tex. 2006) (emphasis removed) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). We "give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). Addressing oil and gas leases in particular, we have explained that where the lease "expressly defines the duty, we will not impose a more stringent obligation unless it is clear that the parties intended to [do so]." *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).

Further, we may "consult the facts and circumstances surrounding a negotiated contract's execution to aid the interpretation of its language." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 757 (Tex. 2018). That is, we may consider "objectively determinable facts and circumstances that contextualize the parties' transaction" and "inform" the meaning of the language used, but we may not use surrounding circumstances to alter or contradict an unambiguous contract's terms. *Id.* at 758; *see also First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) ("[C]ourts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say.").

5

**B. Analysis**

Here, the pertinent lease provision states that if "a well is completed as a producer of oil and/or gas on land adjacent and contiguous to the leased premises, and within 467 feet of the premises covered by this lease," then within 120 days of the well's completion Murphy must "commence drilling operations on the leased acreage and thereafter continue the drilling of such off-set well or wells with due diligence to a depth adequate to test the same formation from which the well or wells are producing from [sic] on the adjacent acreage." The parties do not dispute that Murphy commenced drilling operations on the leased acreage within 120 days after the Lucas well's completion, nor do they dispute that Murphy continued drilling the Herbst well "with due diligence to a depth adequate to test the same formation" as the triggering well. On this record, the trial court concluded that "Murphy complied with the specific terms of the lease," which placed no restriction on the offset well's location "in terms of how many feet from the lease line."

The court of appeals disagreed, holding that Murphy did not conclusively establish the Herbst well satisfied the "commonly understood meaning" of the term "offset well." 497 S.W.3d at 514. Noting that an offset well is generally recognized as a well that protects against drainage, *id.* at 514–15, the court held that Murphy's summary judgment burden was "to conclusively prove the Herbst well was protecting the [leased] tracts from drainage by the Lucas well," *id.* at 515–16. Without such a showing, the court concluded Murphy did not prove as a matter of law that the Herbst well was an offset well as the leases required and Murphy thus was not entitled to summary judgment. *Id.* at 517.

Taking a different but related approach, Herbst contends that the provision at issue, which is triggered by a producing well within 467 feet of the lease boundary, is intended to protect against the risk of drainage while eliminating any dispute over whether drainage is in fact occurring.[3] In light of that purported purpose, Herbst argues that an offset well "must be in close proximity to the lease line adjacent to the tract where the neighboring well is located." Herbst maintains that the Herbst well, drilled 1,800 feet away from the lease line and 2,100 feet from the triggering Lucas well, necessarily did not "offset" that well.

Both the court of appeals' and Herbst's interpretations of the provision at issue depend on the significance of its inclusion of the term "off-set well." We have recognized that drilling an offset well can be a method of protecting against drainage, which occurs when a well produces oil or gas that migrates from another owner's property. *E.g.*, *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 253 (Tex. 2004) ("Drainage may be prevented by drilling an offset well."); *Lenape Res. v. Tenn. Gas Pipeline*, 925 S.W.2d 565, 583 (Tex. 1996) (noting that an operator's implied duty to protect the leasehold from drainage "could give rise to a duty to drill an offset well under certain circumstances"). However, the provision's only specific requirements with respect to where to drill "such off-set well" are that it be "on the leased acreage" and "to a depth adequate to test the same formation" from which the triggering well is producing. The clause does not reference drainage. Nor, in contrast to the express proximity requirement for the *triggering* well ("within 467 feet" of the lease boundary), does the provision place such a restriction on the well

---

[3] The parties agree that actual drainage was not required to trigger Murphy's obligations under the provision. By contrast, to prove breach of the implied covenant to protect against drainage, a lessor must show "substantial drainage from the lessor's field" and "that a reasonably prudent operator would have acted to prevent the drainage." *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 253 (Tex. 2004). This implied covenant is not at issue here.

7

Murphy must drill in response. Murphy thus maintains that it did exactly what the plain language of the leases requires in order to "offset," i.e., "counterbalance" or "compensate" for, the Lucas well's production. *Offset*, WEBSTER'S THIRD INT'L DICTIONARY 1567 (2002).

Considering the leases' express requirements in light of the horizontal-drilling context in which the leases were executed, we agree with Murphy that it complied with the offset provision as a matter of law. Neither the court of appeals' reading of the provision to require a showing of actual protection against drainage nor Herbst's reading of it to contain an implied proximity requirement is a reasonable interpretation of the language the parties chose.

### 1. Context

The leases were executed in 2009, and as noted, Herbst does not dispute that they were drafted with horizontal shale drilling in mind.[4] The realities of this type of drilling are thus part of the "facts and circumstances surrounding the contract's execution" that may "inform" our construction of the lease language. *URI, Inc.*, 543 S.W.3d at 757–58, 765 (explaining that such circumstances can "provide context that elucidates the meaning of the words employed" but cannot be used to "add[] to, alter[], or contradict[] the contract's text"); *see also Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (noting that such circumstances include "the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties").

---

[4] "Indeed, the Eagle Ford shale was not even shown to be viable until 2008, due in large part to the relatively new drilling and completion process of horizontal drilling and multi-stage hydraulic fracturing required for production." Bret Wells, *Please Give Us One More Oil Boom—I Promise Not to Screw It Up This Time: The Broken Promise of Casinghead Gas Flaring in the Eagle Ford Shale*, 9 TEX. J. OIL GAS & ENERGY L. 319, 348 (2013–2014).

Both the implied covenant to protect against drainage and express lease provisions serving a similar purpose arose in the context of vertical wells, which "effectively drain[] a surrounding area exhibiting high natural porosity and permeability." Benjamin Holliday, *New Oil and Old Laws: Problems in Allocation of Production to Owners of Non-Participating Royalty Interests in the Era of Horizontal Drilling*, 44 ST. MARY'S L.J. 771, 813 (2013). By contrast, horizontal drilling in conjunction with hydraulic fracturing allows developers to profitably extract oil and gas directly from the less permeable source rock. *See* Bret Wells, *Please Give Us One More Oil Boom—I Promise Not to Screw It Up This Time: The Broken Promise of Casinghead Gas Flaring in the Eagle Ford Shale*, 9 TEX. J. OIL GAS & ENERGY L. 319, 348 (2013–2014). The locations of both the vertical portion of a horizontal well and the nonperforated portions of the horizontal wellbore are essentially irrelevant for production purposes.[5] Rather, the perforated portions of the horizontal wellbore are the points at which oil and gas is drained and produced from the surrounding rock. *See* Holliday, 44 ST. MARY'S L.J. at 779. Further, commentators have recognized that hydrocarbons in "the tight reservoirs developed by horizontal drilling . . . are not susceptible to migration in the same fashion as found in formations traditionally targeted by vertical drilling." *Id.* at 813; *see also* Wells, 9 TEX. J. OIL GAS & ENERGY L. at 333–34; Kelly Hwa, Note, *Hydraulic Fracturing and Forced Pooling Laws: Why Fracking Operators' Use of Decades-Old Laws to Compel Access to Properties Must*

---

[5] To drill a horizontal well, operators drill vertically into a known formation and then continue the wellbore horizontally through the formation at the desired depth. *See* Holliday, 44 ST. MARY'S L.J. at 777–78. Hydraulic fracturing involves pumping fluids and proppants into a well to cause and sustain cracks in the rock, allowing oil and gas to flow into the wellbore. *Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 6–7 (Tex. 2008).

*Be Reexamined*, 63 WAYNE L. REV. 105, 121 (2017) (noting the non-migratory nature of shale gas and the minimal risk of drainage from adjoining property in the horizontal drilling context).[6]

With this backdrop in mind, we turn to the leases at issue, in which the parties have expressly agreed on both when the offset provision is triggered and what Murphy's three options are in the event it applies. If Murphy elects to comply with the provision by drilling a well rather than paying additional royalties or releasing acreage, the provision specifically describes when (commencing within 120 days of the triggering well's completion and continuing with reasonable diligence) and where (on the leased acreage to a depth adequate to test the same formation from which the triggering well is producing) Murphy must drill.

### 2. Unreasonableness of Implied Proximity Requirement

Although the leases' express language includes no proximity requirement for the offset well, Herbst urges us to imply such a restriction. Herbst complains that failing to do so renders the phrase "offset well" meaningless, thereby writing the word "offset" out of the provision entirely. We disagree. The phrase "offset well" undoubtedly has meaning; the pertinent question is what that meaning is. For the reasons discussed below, we hold that the meaning Herbst ascribes—imposing a location or proximity requirement that goes beyond the leases' express language—is an unreasonable interpretation of the language the parties chose. *See Exxon Corp.*, 348 S.W.3d at 215 (where the lease "expressly defines the duty, we will not impose a more stringent obligation unless it is clear that the parties intended to [do so]").[7]

---

[6] In support of its summary judgment motion, Murphy submitted an expert report similarly noting that "the conventional concept of drainage across lease lines has limited application in the [Eagle Ford Shale]."

[7] Herbst offers several location options that could purportedly comply with the provision, including 330 feet from the lease line (the minimum distance allowed by Railroad Commission rules), 350 feet from the lease line (the distance that would cause the lease line to bisect the two wells), and 467 feet from the lease line (the distance

As noted, Herbst contends an offset well is necessarily one that protects against drainage and that proximity to the draining well is necessary to effectuate that purpose. This is a reasonable premise in the context of vertical drilling, where placement of an offset well is an important factor in minimizing the amount of oil or gas being drained. *See Elliff*, 210 S.W.2d at 561 (noting the recognized principle that oil and gas found in underground reservoirs "will migrate across property lines towards any low pressure area created by production from the common pool"). But the same principle does not apply in the context of horizontal drilling and hydraulic fracturing in the Eagle Ford Shale.

First, the only locations that matter in the horizontal-drilling context are the locations of the perforated and fractured portions of the horizontal wellbore. A well may be drilled in close proximity to the lease boundary, yet have absolutely no chance of preventing (or causing) drainage depending on the direction of the horizontal wellbore and the placement of the perforations. *See* Holliday, 44 St. Mary's L.J. at 779 (explaining that "horizontal drilling increases the exposure of the perforated (i.e., producing) portion of the wellbore"). Suppose, for example, the Lucas well's surface location was within 467 feet of the lease line, but the horizontal wellbore traveled perpendicular to and away from, rather than parallel to, the lease line. In that case, protecting against drainage would be a logical impossibility. As this hypothetical illustrates, if the parties had intended the offset well to protect against drainage, the provision would presumably have included requirements regarding the direction and placement of the perforated portions of the horizontal wellbore.

---

requirement for a triggering well under the offset provision). In our view, this highlights a significant problem with implying a proximity requirement in the instant context; it inevitably leads to uncertainty—and, in turn, potential litigation—over how close is close enough.

11

The dissent nevertheless insists that incorporating an intent to protect against drainage into the use of the term "offset well" would be in accordance with "decades of the industry's usage." *Post* at ___. But even leaving aside the ineffectiveness of a proximity requirement in effectuating that intent, discussed above, this conclusion ignores the absence of a significant possibility of drainage occurring in this context in the first instance.[8] It is undisputed that the leases at issue, which govern tracts within the tight Eagle Ford Shale formation, contemplated the use of horizontal drilling and hydraulic fracturing, both of which are necessary to economically recover oil and gas from such formations. Wells, 9 TEX. J. OIL GAS & ENERGY L. at 320. And as noted, commentators recognize the minimal risk of drainage in this context. *E.g.*, *id.* at 333–34 ("[G]iven the low permeability of the Eagle Ford shale formation, the historic issues of conventional formations—the risk of substantial drainage from neighboring tracts and the risk of not allowing the formation to produce at its maximum efficient recovery rate—would appear to be largely inapposite with unconventional shale formations.").

In light of this context, the court of appeals' holding that Murphy could prevail only by affirmatively demonstrating that the Herbst well was protecting against drainage, despite the absence of a significant possibility that drainage was in fact occurring, is simply not logical. And while Herbst does not argue that Murphy had such a burden, Herbst's contention that the parties intended to presume drainage by the Lucas well, and correspondingly intended to prevent such drainage via the offset well, is similarly not reasonable.[9] Even if it were, as discussed,

---

[8] The dissent's lengthy string citation regarding the "traditional and widespread industry meaning of 'offset' well" consists largely of authorities that predate the advent of the type of drilling at issue here. *Post* at ___.

[9] The dissent opines that the leases reference both vertical and horizontal drilling and are thus intended to apply to both. *Id.* at ___. But no one disputes that traditional drilling techniques are not effective in tight shale formations like the Eagle Ford.

requiring the offset well to be drilled in close proximity to the lease line would not address the problem.

### 3. The Only Reasonable Construction

While the leases do not provide a formal definition of the term "offset well," the phrase is nevertheless internally defined by the leases' description of where and to what depth the offset well must be drilled.[10]   And these requirements qualify such a well as one that "serves to counterbalance or to compensate for" a triggering well on the adjacent property.  *Offset*, WEBSTER'S THIRD INT'L DICTIONARY 1567 (2002).  The fact that the leases specify exactly what is to be done once the offset provision is triggered, and do not mention proximity, is significant. The language of the provision is direct: when triggered, if Murphy elects to respond by drilling a well, it must commence drilling operations within 120 days from the triggering well's completion and must continue drilling with due diligence "to a depth adequate to test the same formation from which the well or wells are producing from [sic] on the adjacent acreage." Murphy was thus required to drill a well in accordance with this specific instruction, and no more.

This makes complete sense if the parties intended to require accelerated drilling when production from a well on an adjacent tract evidenced that the leased tract was also capable of production.   While this would not prevent drainage, it would compensate Herbst by counterbalancing against production on the adjacent tract.   And this is the only reasonable

---

[10] The provision's wording is telling.  If triggered, it does not simply give Murphy the option to drill an offset well.  Rather, it gives Murphy the option to "commence drilling operations on the leased acreage" and to continue drilling "such off-set well" to a particular depth.  "[S]uch off-set well" thus refers back to what is drilled on the leased acreage to the required depth, and no more.

interpretation of the provision in light of the parties' recognition of the horizontal shale drilling at issue.

In so holding, we recognize that leases executed in other settings—not involving shale plays and hydraulic fracturing from horizontal wellbores—may utilize similar provisions that remain silent as to proximity requirements. But in accordance with our holding in *URI*, we must account for the circumstances in which these leases were executed. Therefore, we limit our holding to the circumstances at hand, which involve unconventional production in tight shale formations. We express no opinion as to the proper interpretation of similar clauses outside this context.

### III. Conclusion

Ultimately, we interpret a lease agreement according to its express language, and we do not read into the lease more stringent obligations than the parties intend. Here, the offset provision contains specific requirements, and Murphy met those requirements. Herbst's reading of the offset provision to contain a proximity requirement constitutes a significant deviation from the language the parties chose and a failure to acknowledge the circumstances in which the leases were executed. Further, it would result in a significant windfall in light of the royalties Herbst is undisputedly collecting based on production from the Herbst well. Accordingly, the trial court properly granted summary judgment in Murphy's favor. We reverse the court of appeals' judgment and reinstate the trial court's judgment as modified to remove the award of appellate attorney's fees.

 

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 1, 2018