# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-08-00056-CV

**Mark Hackett, Appellant**

**v.**

**Littlepage & Booth; Littlepage & Associates, P.C.; and Michles & Booth, P.A., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
### NO. D-1-GN-03-003365, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our opinion and judgment dated January 16, 2009, and substitute the following in their place. We overrule appellant's motion for rehearing.

Appellant Mark Hackett brought suit against appellees Littlepage & Booth, Littlepage & Associates, P.C., and Michles & Booth, P.A.,[1] alleging legal malpractice and deceptive trade practices stemming from the Law Firms' representation of Hackett, specifically the Law Firms' failure to file suit against two of Hackett's treating physicians for medical malpractice. In four issues, Hackett challenges the district court's exclusion of Hackett's medical expert and its grant

---

[1] Littlepage & Booth is a joint venture of Littlepage & Associates, P.C., and Michles & Booth, P.A. Because their interests align, we refer to appellees Littlepage & Booth, Littlepage & Associates, P.C., and Michles & Booth, P.A., collectively as "the Law Firms" unless otherwise stated.

of a no-evidence summary judgment in favor of the Law Firms.  Because we conclude the district court did not abuse its discretion in excluding Hackett's medical expert and did not err in granting summary judgment, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Hackett had back surgery in 1998, and a pre-operative urinalysis showed an abnormal protein level—a "+1 proteinuria" level—which is a marker for kidney disease.  The result from the urinalysis did not prevent or otherwise affect the back surgery.  In 1999, Hackett's neurosurgeon, Dr. Lee Berlad, referred Hackett to Dr. Neal Blauzvern, an anesthesiologist and pain management specialist.  Dr. Blauzvern treated Hackett from April 1999 through August 1999 and, as part of the treatment, Dr. Blauzvern prescribed the non-steroidal anti-inflammatory drug ("NSAID") Celebrex.[2]  Hackett took Celebrex for approximately five months.  By the fall of 1999, Hackett began experiencing painful symptoms, including swelling and exhaustion.  In January 2000, Hackett was diagnosed with membranous glomerulonephritis ("MGN").  MGN is a common kidney disease in adults.

In February 2001, Hackett hired Littlepage & Associates, P.C., on a contingent-fee basis.  Littlepage & Associates, P.C., filed a products liability lawsuit on Hackett's behalf against the manufacturers of Celebrex.[3]  Eventually, the Law Firms requested and obtained leave of court

---

[2] Celebrex, a widely prescribed drug, is one of a subclass of NSAIDs called "COX-2 Inhibitors."

[3] Michles & Booth, P.A., appeared as co-counsel after the products liability suit was filed.

to withdraw as counsel and the defendant manufacturers obtained a summary judgment against Hackett.[4]

Hackett filed this suit in 2003 against the Law Firms, asserting that they should have filed a medical malpractice suit against Hackett's treating physicians, Dr. Berlad and Dr. Blauzvern. He contends that the treating physicians erred by prescribing him Celebrex in light of his abnormal pre-operative urinalysis and that Celebrex exacerbated his then undiagnosed renal disease. Dr. Blauzvern prescribed Celebrex for approximately five months. Dr. Berlad did not prescribe Celebrex, but he received copies of Dr. Blauzvern's treatment plan for Hackett prescribing Celebrex. Hackett does not assert any other basis for a medical malpractice claim against his treating physicians.

Hackett's pleadings allege negligence and violations of the Texas Deceptive Trade Practices Act ("DTPA") against the Law Firms. *See* Tex. Bus. & Com. Code Ann. § 17.49-.50 (West Supp. 2008). Hackett designated Dr. David Lowenthal, a nephrologist and pharmacologist, to testify to the applicable standard of care of the two treating physicians, their breaches of the standard of care, and the causative link between Celebrex and Hackett's renal condition. After deposing Dr. Lowenthal, Littlepage & Associates, P.C., and Littlepage & Booth filed a motion to exclude Dr. Lowenthal's testimony asserting that his testimony was unreliable. Michles & Booth, P.A., also filed a motion to strike Dr. Lowenthal as Hackett's expert on similar grounds. After a

---

[4] Hackett does not contend that the Law Firms were negligent in the products liability action against the drug manufacturers.

3

hearing, the district court granted both motions, striking Dr. Lowenthal as Hackett's expert and excluding his testimony.

The Law Firms thereafter filed a no-evidence motion for summary judgment. The Law Firms' motion asserted that Hackett lacked evidence on the causation and damages elements for both his negligence and DTPA claims. Hackett responded to the motions, filing summary judgment evidence, including an affidavit from Hackett; an affidavit from John Allen, an attorney designated by Hackett as an expert; affidavits and deposition testimony from Dr. Lowenthal; and deposition testimony of Dr. Stephen Fadem, one of the Law Firms' medical experts. The Law Firms objected to Dr. Lowenthal's affidavits and deposition testimony based on the district court's prior ruling excluding his testimony. The Law Firms objected to Allen's opinions "to the extent he purports to provide expert testimony on any medical or scientific issue because he is unqualified to opine on these matters." After a hearing in November 2007, the district court sustained the Law Firms' objections to Hackett's summary judgment evidence and granted summary judgment. The district court entered a final take-nothing judgment in January 2008. This appeal followed.

**ANALYSIS**

In four issues, Hackett challenges the district court's exclusion of his medical expert and grant of no-evidence summary judgment in favor of the Law Firms. In his first two issues, Hackett contends that the district court abused its discretion by striking his medical expert and sustaining the Law Firms' objections to his summary judgment evidence. In his third issue, he contends that the district court "erred by reading a 'suit within a suit' requirement" into his DTPA

4

claim. In his fourth issue, he contends that the district court erred by granting summary judgment and rendering a take nothing judgment on all claims.

***Standard of Review***

We review the district court's decision to grant summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). A party seeking a no-evidence summary judgment must assert that "there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). "The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact" on the challenged element. *Id.*; *see Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581-82 (Tex. 2006). In deciding whether there is a disputed material fact issue precluding summary judgment, we must take evidence favorable to the nonmovant as true, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor. *Mack Trucks*, 206 S.W.3d at 582; *Dorsett*, 164 S.W.3d at 661. Where the trial court does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

Hackett also challenges the district court's exclusion of his medical expert's testimony. We review a trial court's decision to exclude expert witness testimony under an abuse of discretion standard. *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) (trial court has "broad discretion to determine admissibility"). A decision sustaining objections to

5

summary judgment evidence similarly is reviewed for abuse of discretion. *Bradford Partners II, L.P. v. Fahning*, 231 S.W.3d 513, 521 (Tex. App.—Dallas 2007, no pet.); *Sanders v. Shelton*, 970 S.W.2d 721, 727 (Tex. App.—Austin 1998, pet. denied). The test for an abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A trial court abuses its discretion if it fails to analyze or apply the law correctly. *Powell v. Stover*, 165 S.W.3d 322, 324 (Tex. 2005).

### *Exclusion of Hackett's Medical Expert*

In his first two issues, Hackett challenges the district court's exclusion of his designated medical expert. In his first issue, Hackett contends that the district court abused its discretion by striking Dr. Lowenthal as Hackett's expert because he was qualified to testify and his testimony was reliable and admissible pursuant to Texas Rule of Evidence 702.[5] In his second issue, Hackett contends that, if the district court erred in striking Dr. Lowenthal as his expert, the district court also abused its discretion in sustaining the Law Firms' objections to Dr. Lowenthal's affidavits and deposition testimony as summary judgment evidence.

Texas Rule of Evidence 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

---

[5] In addition to the ground that Dr. Lowenthal's testimony was not reliable, Littlepage & Booth and Littlepage & Associates, P.C., assert that Dr. Lowenthal, a nephrologist and pharmacologist, was unqualified to testify to the applicable standard of care of a neurosurgeon or an anesthesiologist and pain management specialist. Michles & Booth, P.A., does not assert this additional ground to exclude Dr. Lowenthal's testimony. Because it is dispositive, we limit our review to the ground that Dr. Lowenthal's testimony was not reliable. *See* Tex. R. App. P. 47.1.

6

witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. Rule 702 imposes a "gatekeeper" obligation on the trial court to ensure relevance and reliability of expert testimony. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 722-26 (Tex. 1998). Once the party opposing expert testimony objects, the proponent bears the burden to demonstrate admissibility. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). If an expert's testimony is not reliable, it is not evidence. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex. 1997). Expert testimony is unreliable if the court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill*, 972 S.W.2d at 726. A trial court does not err by excluding expert opinion testimony which is connected to existing data only by the expert's *ipse dixit*. *See id.* at 727; *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 801 (Tex. 2006) (citing *Havner*, 953 S.W.2d at 712) ("If the expert brings only his credentials and a subjective opinion, his testimony is fundamentally unsupported and therefore of no assistance to the jury.").

"The reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions." *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 254 (Tex. 2004). In reviewing the reliability of an expert's testimony, the court is not to determine whether the expert's conclusions are correct but "whether the analysis used to reach those conclusions is reliable." *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). Expert testimony involving scientific knowledge that is not grounded "'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" *Robinson*, 923 S.W.2d at

7

557 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)); *see also Havner*, 953 S.W.2d at 711 (expert's "bare opinions will not suffice" and the "substance of the testimony must be considered"). Factors that a court may consider in making the threshold determination of admissibility under rule 702 include: (i) whether the theory has been tested or can be tested, (ii) the extent to which the theory relies on the expert's subjective interpretation, (iii) whether the underlying theory has been subjected to peer review or publication, (iv) the technique's potential rate of error, (v) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community, and (vi) non-judicial uses that have been made of the theory or technique. *Robinson*, 923 S.W.2d at 557.

Under these well-established standards, we review Dr. Lowenthal's deposition testimony and affidavits. Dr. Lowenthal averred to the effect of Celebrex on Hackett's renal condition:

> Prescribing the drug Celebrex was a significant factor in the continued deterioration of Hackett's renal condition. Hackett's renal condition dictated a different course of treatment in 1998 than that which he received. Typically, the sooner renal problems are diagnosed and treatment begun, the chances of successful treatment are greatly enhanced. Consequently, the treatment of Hackett's condition by Drs. Berlad and Blauzvern in all reasonable medical probability, which means more likely than not, materially caused the worsening of Hackett's condition resulting in much greater harm. . . . It is very probable that Hackett's renal condition, due to the effects of Celebrex on his kidneys, has so damaged his kidneys that a transplant may be necessary. Medical costs of a transplant exceed $50,000.00 and may be a limiting factor on his life.

He averred that his "comments and observations" were based on Hackett's medical records, his "knowledge and experience in practicing and teaching pharmacology," and the "labeling information" for Celebrex.[6] In his supplemental affidavit, Dr. Lowenthal averred:

> For reasons stated in my earlier affidavit, supported by the various case studies and medical literature,[7] cited [in the supplemental affidavit], my opinion remains the same; in all reasonable medical probability, the use and prescription of Celebrex, an NSAID, materially contributed to the deteriorating renal condition of Mr. Hackett.

We review the foundational data underlying Dr. Lowenthal's conclusion that Celebrex adversely affected Hackett's renal condition. *See Helton*, 133 S.W.3d at 254. Hackett's medical records included that Hackett's pre-operative urinalysis in 1998 showed "+1 proteinuria" and was marked "abnormal," Hackett was prescribed Celebrex for approximately five months in 1999, and he was diagnosed with MGN in 2000. Hackett's medical records show a temporal correlation between his diagnosis and taking Celebrex—after Hackett was prescribed Celebrex for approximately five months, his renal condition worsened and he was diagnosed with MGN. But, his renal condition did not improve after he discontinued taking Celebrex. At best, Hackett's medical records do not foreclose Dr. Lowenthal's conclusions.

---

[6] The "labeling information" is also referred to by the parties as the "package insert" and is the same information that appears in a book published annually known as the "Physician's Desk Reference" ("PDR").

[7] His stated sources in the supplemental affidavit are: (i) article by "Dr. Rosen, another expert for the Defendants," entitled "Membranous Glomerulopathy and Acute Interstitial Nephritis Following Treatment with Celecoxib," (ii) articles from Harrison's Principles of Internal Medicine; (iii) "UPMC Pharmacy and Therapeutics Committee Formulary Review," (iv) article from American Journal of Kidney Diseases entitled "Are Selective COX-2 Inhibitors Nephrotoxic," and (v) article entitled "NSAID Use Linked to Membranous Nephropathy."

9

As to the labeling information for Celebrex, Dr. Lowenthal testified in his deposition that the information does not "suggest" an association between MGN and Celebrex:

Q.     And I think you described the PDR for us and what information is contained in there a little earlier. And one of the things that the manufacturer is required to include in the PDR is contraindications; isn't that correct?

A.     Yes.

Q.     And contraindications are what?

A.     Instances in which the drug cannot be given or should not be given.

Q.     And in the contraindications for Celebrex, there's no contraindication of giving it to people with plus one positive proteinuria, is there?

A.     Not specifically. That's a moot point.

\* \* \*

Q.     Okay. Nowhere in the PDR does the manufacturer or the FDA suggest that [MGN] may be associated with the use of Celebrex?

A.     Correct.

The labeling information for Celebrex does not address a causal association between Celebrex and MGN to provide support for Dr. Lowenthal's conclusion that taking Celebrex worsened Hackett's renal condition.

The case studies and medical literature that Dr. Lowenthal cited in his supplemental affidavit similarly do not address a causal association between Celebrex and MGN; they either concern drugs other than Celebrex, do not reference MGN, or are otherwise inapplicable. Dr. Lowenthal testified at his deposition that he did not do any research himself in coming to his

10

conclusions and that he could not "pinpoint something for you" when asked if he was aware of "any studies in the literature that we've talked about all day today which examine exposure to Celebrex for four and a half months or less with any effect on the kidney."[8]

Dr. Lowenthal testified in his deposition that he knew of only one other case in which Celebrex was associated with MGN and, in that case, the 78-year-old patient's "proteinuria went away" when she discontinued taking Celebrex. The patient had taken Celebrex for seven months in 2003. In contrast, Hackett's proteinuria level did not improve after he stopped taking Celebrex. Dr. Lowenthal agreed that Hackett's case would be unique in the medical literature.[9] Dr. Lowenthal

---

[8] MGN is one of the larger class of kidney conditions called "nephrotic syndrome" and Celebrex is one of the larger class of NSAIDs. Dr. Lowenthal provided sources that address NSAIDs and "nephrotic syndrome" but those sources do not provide support for an association between Celebrex and MGN. For example, Dr. Lowenthal testified that the "Meta-analysis from the Journal of the American Medical Association" concerned "Vioxx" and "not Celebrex"; the "abstract" from "Dr. Zhang" "did not specifically talk about [MGN]"; the "case report about whether selective COX-2 Inhibitors are nephrotoxic" was not "related at all to Celebrex and [MGN]"; and the article in the Medical Tribune "NSAIDs Link to Membranous Nephropathy" referred to Ibuprofen, not Celebrex.

[9] Dr. Lowenthal testified in his deposition:

Q.    And isn't it true that in all of the literature in which nonsteroidals are associated with proteinuria, that as soon as they discontinue the drug, the proteinuria went away, didn't it?

A.    (Nods head.)

Q.    Yes?

A.    Yes.

Q.    In none of these studies did the proteinuria get worse like Mr. Hackett's did?

A.    Right.

11

did not rule out other possible causes for Hackett's renal condition and he was unable to provide case studies, peer review, or medical publications to support his conclusion that Celebrex "caused the worsening of Hackett's condition." *See Havner*, 953 S.W.2d at 720; *Robinson*, 923 S.W.2d at 559.

Hackett contends that the trial court erred by applying the toxic tort standards set forth in *Havner* for proving causation to his underlying medical malpractice claim. He contends that the *Havner* standards apply only to toxic tort cases, including general and specific causation and the role of epidemiology studies.[10] *See Havner*, 953 S.W.2d at 714-75; *Halim v. Ramchandani*, 203 S.W.3d 482, 489 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (medical malpractice case in which court applied general reliability requirements as established in *Robinson* and not *Havner* analysis). The issue in *Havner* was whether there was scientifically reliable evidence to support the verdict that a particular drug caused a birth defect. *Havner*, 953 S.W.2d at 708, 730. The issue similarly here is whether Dr. Lowenthal's testimony was scientifically reliable that Celebrex caused or worsened Hackett's renal condition. To the extent the district court relied on the *Havner* standards for excluding expert testimony, we conclude the district court did not abuse its discretion.[11]

---

Q.    So Mr. Hackett would be the only person that ever took Celebrex that got proteinuria or had [MGN] whose proteinuria got worse upon discontinuation of the drug, isn't he?

A.    Yes.

[10] Epidemiological studies "examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 715 (Tex. 1997).

[11] The plaintiffs in *Havner* relied on epidemiological studies for proof of general causation. *See id.* The *Havner* standards for the admission of epidemiology studies are not at issue here; Hackett does not rely on an epidemiological study that links Celebrex with MGN. *See*

In any event, the district court did not specify its ground for excluding Dr. Lowenthal. The district court could have found that Dr. Lowenthal's conclusions, lacking foundational data linking Celebrex to MGN, amounted to no more than "unsupported speculation," *see Robinson*, 923 S.W.2d at 557, or that there was "too great an analytical gap" between the underlying data and Dr. Lowenthal's conclusions. *See Gammill*, 972 S.W.2d at 726. We conclude that the district court did not abuse its discretion by excluding Dr. Lowenthal and sustaining the Law Firms' objections to Dr. Lowenthal's deposition testimony and affidavits as summary judgment evidence. We overrule Hackett's first and second issue.

### *No-Evidence Summary Judgment*

In his third and fourth issues, Hackett challenges the district court's grant of summary judgment. In his third issue, Hackett contends that the district court "erred by reading a 'suit within a suit' requirement" into his DTPA claim. In his fourth issue, Hackett contends that the district court erred by granting summary judgment and rendering a take-nothing judgment on all his claims. The Law Firms sought no-evidence summary judgment on the causation and damages elements of both Hackett's DTPA and negligence claims. We turn first to Hackett's negligence claim.

#### 1. Hackett's negligence claim

Hackett contends that, with or without Dr. Lowenthal's testimony, the no-evidence summary judgment as to his negligence claim must be reversed. To support that there is a genuine

---

*Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 239 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.) (when an expert relies on epidemiology studies, the studies must meet certain criteria as outlined in *Havner*).

13

issue of material fact on causation, he relies on Dr. Lowenthal's affidavits and deposition testimony and the Law Firms' expert Dr. Stephen Fadem's deposition testimony. To support the damages element, Hackett relies on Dr. Lowenthal's testimony that Hackett will likely need a kidney transplant that will exceed costs of $50,000. He also contends that he was not obligated to present summary judgment evidence of damages of the "precise" amount that he would have collected, but that he "suffered harm due to MGN."

To satisfy the causation element of a negligence claim for legal malpractice when the plaintiff's allegation is that some failure on the attorney's part caused an adverse result in prior litigation, a plaintiff must establish that he would have prevailed in the underlying case but for the attorney's negligence. *Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 117 (Tex. 2004); *Cosgrove v. Grimes*, 774 S.W.2d 662, 665-66 (Tex. 1989). This causation burden is referred to as the "suit within a suit" requirement. *Latham v. Castillo*, 972 S.W.2d 66, 69 (Tex. 1998). To avoid no-evidence summary judgment as to the causation element then, it was Hackett's burden to produce summary judgment evidence that supported each element of his alleged medical malpractice claim against his treating physicians. The elements of a medical malpractice claim are: (i) a physician's duty to act according to a certain standard of care; (ii) breach of the applicable standard of care; (iii) an injury; and (iv) a causal connection between the breach of care and the injury. *See Grider v. O'Brien*, 260 S.W.3d 49, 57 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) (West 2005). "The general rule has long

14

been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007).

Hackett does not dispute that, to satisfy his burden in response to the no-evidence summary judgment on causation, he had to produce expert testimony to support that the treating physicians breached an applicable standard of care and that their breach caused him injury. Because we have determined that the district court did not abuse its discretion in excluding Dr. Lowenthal's testimony and sustaining the Law Firms' objections to Dr. Lowenthal's deposition testimony and affidavits as summary judgment evidence, the issue is whether Dr. Fadem's testimony raised genuine issues of material fact that the treating physicians breached an applicable standard of care concerning Celebrex and that there was a causal connection between their breaches and Hackett's renal condition. *See* Tex. R. Civ. P. 166a(i); *O'Brien*, 260 S.W.3d at 57.

Dr. Fadem testified that Celebrex did not adversely affect Hackett's kidney function and he was unaware of any publication that suggested that Celebrex exacerbated MGN:

> Q.   Okay.  Does it appear to you that the Celebrex had any effect at all on his kidney function - -
>
> A.   No.
>
> Q.   - - based upon looking at the labs from 1998 and looking at them from this year?
>
> A.   I never thought it did in the beginning, but now I'm almost convinced that he's fine.

15

> Q. Have you seen any articles that talk about Celebrex exacerbating [MGN], making it worse?
>
> A. Never. I've never seen one publication like that and I've looked. I've looked several times.
>
> Q. Have there been any case reports where someone has taken Celebrex with an underlying membranous disease and it has been exacerbated as a result of taking Celebrex?
>
> A. Nobody has published anything like that ever.

He testified that MGN is the most common cause of nephrotic syndrome in adults and millions of people take Celebrex every day so if there was an association between Celebrex and MGN, he would expect to see some literature to that effect in the medical community. He also testified that, if Celebrex had any effect, it likely aided Hackett's kidney function: "If anything, Celebrex would have made it better because that's what the literature is now showing."

Even if we were to conclude then that Dr. Fadem's testimony raised a material fact issue whether the treating physicians breached an applicable standard of care concerning Celebrex, Dr. Fadem's testimony does not raise a material fact issue whether there is a causal connection between Celebrex and MGN. Without evidence to support a causal connection between Celebrex and MGN, we conclude that, on this record, Hackett did not satisfy his burden to raise a genuine issue of material fact on the causation element of his negligence claim against the Law Firms. *See* Tex. R. Civ. P. 166a(i). Because we conclude that the district court did not err in granting no-evidence summary judgment on Hackett's negligence claim on this ground, we need not address the Law Firms' other challenged element, damages. *See Knott*, 128 S.W.3d at 216.

## 2.      Hackett's DTPA claim

In response to the no-evidence motion for summary judgment on his DTPA claim, Hackett contends that his affidavit and the affidavit of John Allen, his legal expert, raise fact issues on both the causation and damages elements of his DTPA claim to preclude no-evidence summary judgment.[12]  Because it is dispositive, we limit our review to the causation element.  *See id.*

Section 17.50(a) of the business and commerce code sets forth the elements of a DTPA claim, including the requirement of "producing cause":

> (a)      A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:
>
> > (1)      the use or employment by any person of a false, misleading, or deceptive act or practice that is:
> >
> > > (A)      specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and
> > >
> > > (B)      relied on by a consumer to the consumer's detriment;. . . [or]
> >
> > (3)      any unconscionable action or course of action by any person. . . .

---

[12]      Hackett alleges in his DTPA pleadings that the Law Firms "made material misrepresentations and engaged in unconscionable conduct" that cannot be "characterized as advice, judgment, or opinion."  Section 17.49(c) of the business and commerce code exempts professional services from DTPA claims except for certain conduct such as "an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion" and "an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion."  Tex. Bus. & Com. Code Ann. § 17.49(c)(1), (3) (West Supp. 2008).  The Law Firms did not challenge that the alleged conduct was actionable under the DTPA in their motions for summary judgment.  As to DTPA damages, Hackett seeks to recover "general damages according to proof, including mental anguish," additional damages based upon the Law Firms' intentional and knowing conduct, and such other damages, including attorney's fees, as are permitted.  Hackett does not assert mental anguish issues as a ground for reversal.

17

Tex. Bus. & Com. Code Ann. § 17.50(a)(1), (3). "Producing cause" under the DTPA requires proof of causation in fact. *Alexander*, 146 S.W.3d at 117. Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury which would not have occurred otherwise. *Prudential Ins. Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 167 (Tex. 1995).

As a preliminary matter, Hackett contends in his third issue that the district court erred "by reading a 'suit within a suit' requirement" into his DTPA claim. He relies on *Latham v. Castillo* to argue that the "suit within a suit" requirement is inapplicable and that he did not need to present medical expert testimony to meet his burden to raise a material fact issue on causation. *See Latham*, 972 S.W.2d at 69 ("DTPA does not require and [the plaintiffs] need not prove the 'suit within a suit' element when suing under the DTPA."). But, as is the case with a negligence claim, a DTPA claimant must prove causation in fact. *See Alexander*, 146 S.W.3d at 117.

One of our sister courts faced analogous causation issues in *Hoover v. Larkin*, 196 S.W.3d 227, 232 (Tex. App.—Houston [1st Dist.] 2006, pet. denied), and *Rangel v. Lapin*, 177 S.W.3d 17, 24 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). In *Hoover*, the court affirmed a no-evidence summary judgment on legal malpractice and DTPA claims because the plaintiff "provides no evidence of causation on any of her causes of action." 196 S.W.3d at 228. As to her DTPA claim, the plaintiff sought incurred attorney's fees in the underlying litigation based on her lawyer's misrepresentation of the terms of a settlement agreement. *Id*. at 232. Noting that "the DTPA requires that a plaintiff prove that 'but for' the attorney's breach of duty, the plaintiff would not have sustained injury," the court concluded that the plaintiff "failed to provide evidence

18

that [her attorney's] wrongful conduct caused her to incur, or fail to recover, the attorney's fees she paid him." *Id*. at 232.

In *Rangel*, the court affirmed summary judgment on the plaintiff's DTPA and legal malpractice claims arising out of the defendant law firm's representation of the plaintiff "in connection with potential litigation for injuries [the plaintiff] sustained in a car crash." 177 S.W.3d at 19. The plaintiff asserted in his DTPA claim that the law firm's "misrepresentations were a producing cause of injury to him, because but for the advice of [the law firm], he would have 'retained a viable products case.'" *Id*. at 23. The court found no evidence of causation to support the plaintiff's DTPA claim:

> As with [the plaintiff's] negligence claims, the DTPA requires that a plaintiff prove that "but for" the attorney's breach of duty, the plaintiff would not have sustained injury. . . . [The plaintiff] has not raised a fact issue as to whether he would have recovered in a suit against [the car manufacturer], thus, no evidence of the producing cause element of [the plaintiff's] DTPA claim exists.

*Id*. at 24 (internal citations omitted). Similarly, Hackett contends in his DTPA claim that "but for" the Law Firms' conduct, he would have had a "viable" medical malpractice claim against the treating physicians. *See id.* at 23.

On this record, we conclude that Hackett had the burden to produce evidence to raise a material fact issue whether he had a "viable" medical malpractice claim to preclude no-evidence summary judgment on causation. We therefore conclude that, to the extent the district court required a "suit within a suit" requirement as a component of causation, the district court did not err. We

19

overrule Hackett's third issue. In this context, we turn then to a review of Hackett's summary judgment evidence to support causation.

In his affidavit, Hackett referred to his back surgery, his physical symptoms, his prescribed treatment of Celebrex, and his diagnosis of kidney disease. He averred that the first time he or his lawyers became aware of his abnormal test result from 1998 was when his deposition was taken in December 2001. He averred to his "understanding from conversations" that the Law Firms would immediately obtain his medical records and investigate all possible claims and parties that could be brought in conjunction with his injuries and that the Law Firms decided not to sue the treating physicians "at this time" but would consider suing them later depending on the investigation. Hackett's affidavit does not address causation—that but for his lawyers' alleged representations and conduct, he sustained his alleged injury, that is, the loss of a "viable" medical malpractice claim. *See id.*

Hackett's legal expert Allen averred to the Law Firms' conduct that supported "claims against the lawyers for misrepresentations and unconscionable conduct under the DTPA," and to his opinion that this conduct was a "producing cause of injuries and damages":

> The Defendants' conduct in failing to disclose material facts, misrepresenting material facts, and conduct deemed unconscionable under the DTPA was a producing cause of injuries and damages to Mr. Hackett because said conduct resulted in the pursuit of an unwinnable claim against the manufacturer of Celebrex while at the same time preventing Mr. Hackett from bringing and prevailing upon his valuable claims against Drs. Berlad and Blauzern.

In reaching his conclusion that the claim against the treating physicians was "valuable," Allen averred that the medical malpractice claims would have been successful because "the medical evidence clearly shows that it was negligent for the doctors to prescribe NSAIDs such as Celebrex to someone with markers for kidney disease without conducting thorough tests beforehand" and relies on Dr. Lowenthal's excluded testimony that "the culpable parties" were the treating physicians. Hackett may not indirectly rely on Dr. Lowenthal's opinions through Allen's affidavit to create a fact issue on causation. *See* Tex. R. Civ. P. 166a(f) (affidavit "shall set forth such facts as would be admissible in evidence"). Further, to the extent Allen purported to provide medical or scientific testimony on causation regarding the viability of Hackett's medical malpractice claims against his treating physicians, the district court excluded his testimony and the district court's ruling is unchallenged. Without admissible testimony that raises a fact issue that Hackett's medical malpractice case was "viable," there was no evidence that, "but for" his lawyers' alleged conduct, Hackett would not have sustained injury. *See Rangel*, 177 S.W.3d at 24.

We conclude that Hackett did not satisfy his burden to raise a genuine issue of material fact on the causation element of his DTPA claim. *See* Tex. R. Civ. P. 166a(i). We overrule Hackett's fourth issue.

## CONCLUSION

Because we conclude that the district court did not abuse its discretion in excluding Hackett's medical expert and did not err in granting summary judgment, we affirm the district court's judgment.

21

_____

Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed on Motion for Rehearing

Filed:  February 20, 2009

22