# Supreme Court of Texas

No. 20-0898

Rosetta Resources Operating, LP,

*Petitioner*,

v.

Kevin Martin, Jamie Martin, and Ashley Lusk,

*Respondents*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

**Argued February 2, 2022**

JUSTICE BUSBY delivered the opinion of the Court.

Justice Huddle and Justice Young did not participate in the decision.

In this oil and gas case, the parties dispute the meaning and application of an express covenant to protect against drainage. The covenant appears in a unique and mistake-ridden lease addendum, which expressly limits the location of wells that may trigger the lessee's obligation to protect against drainage but does not directly address the

location of wells that may cause drainage. The lessor plaintiffs argue that the covenant's language allows for separate triggering and draining wells, and that the lessee breached the covenant by failing to protect against drainage from a non-triggering well. The lessee defendant responds that it is only obligated to protect against drainage from the limited class of triggering wells.

We conclude that the addendum is ambiguous because both interpretations of this poorly drafted covenant are reasonable. We also reject the lessee's res judicata defense, but we conclude that the court of appeals improperly reversed the trial court's take-nothing summary judgment on the lessors' tort and statutory claims, which they did not challenge on appeal. We therefore reverse the court of appeals' judgment, reinstate the trial court's summary judgment in part as to the lessors' tort and statutory claims, and remand for further proceedings on their claim for breach of the lease.

## BACKGROUND

The lessors are respondents Kevin Martin, Jamie Martin, and Ashley Lusk (the Martins), who own land in Live Oak County. They entered into mineral lease agreements with Mesquite Development in 2001 and 2006. The leases contain two key provisions related to drainage. Paragraph 5 of the 2001 agreement provided:

> In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within 330 feet of and draining the leased premises, or land pooled therewith, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances. Lessee may at any time execute and deliver to Lessor or place of record a release or

2

releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered.

In 2006, the parties agreed to various amendments and extensions including Addendum 18, which altered the terms of Paragraph 5 and is at issue here. The unique, customized language of Addendum 18 includes several typographical and grammatical errors and lacks helpful punctuation. We have inserted bold numbers and letters into its text (using brackets) to help organize its content and facilitate our analysis. Addendum 18 provides:

> Notwithstanding anything contained herein to the contrary, it is further agreed that **[(1)(a)]** in the event a well is drilled on or in a unit containing part of this acreage or is drilled on acreage adjoining this Lease, **[(b)]** the Lessor [read "Lessee"], or its agent(s) shall protect the Lessee's [read "Lessor's"[1]] undrilled acreage from drainage and **[(2)]** in the opinions of reasonable and prudent operations [read "operators"[2]], **[(a)]** drainage is occurring on the un-drilled acreage, even though the draining well is located over three hundred-thirty (330) feet from the un-drilled acreage, **[(b)]** the Lessee shall spud an offset well on said un-drilled acreage or on a unit containing said acreage within twelve (12) months from the date the drainage began or release the acreage which is un-drilled or is not a part of a unit which is held by production.

---

[1] Both parties agree that "lessor" and "lessee" should be switched due to a scrivener's error.

[2] Rosetta argues that "operations" should read "operators" and claims that the Martins have never argued otherwise.

3

Mesquite assigned its rights as lessee to petitioner Rosetta Resources Operating, LP, in 2007. Shortly thereafter, Newfield Exploration Co. and Dynamic Production, Inc. (collectively Newfield) joined with Rosetta to create the Martin Unit, which contained portions of the Martin Lease (the Martin Pooled Acreage) and property from unrelated leases. The southern portion of the Martin Lease acreage was not included in the unit. Rosetta assigned a percentage of its royalty interest in the Martin Pooled Acreage to Newfield but retained its entire interest in the non-unitized acreage to the south.

In 2008, Newfield drilled a well on the Martin Pooled Acreage (the Martin Well). In 2009, Newfield created a separate unit (the Simmons Unit) that does not adjoin the Martin Lease and drilled a well on that acreage (the Simmons Well).

In 2014, the Martins sued Rosetta and Newfield for breach of Addendum 18, alleging that the addendum obligated the lessees to protect the undrilled lease acreage south of the Martin Unit from drainage caused by the Simmons Well. The Martins also brought claims for common-law fraud, negligence, conversion, mineral trespass, breach of fiduciary duty, and violation of the Theft Liability Act. The lessees responded that the Simmons Well had not triggered their obligation to protect the undrilled acreage from drainage because it was not drilled on property adjoining the Martin Lease.

The trial court granted summary judgment for Newfield and severed the claims against it from those against Rosetta. Rosetta then moved for its own summary judgment on all the Martins' claims on several grounds.

4

On appeal from Newfield's summary judgment, the Martins argued—for the first time—that the Martin Well had triggered Addendum 18's covenant to protect against drainage, and that this obligation encompassed any drainage from the Simmons Well. *Martin v. Newfield Expl. Co.*, No. 13-17-00104-CV, 2018 WL 1633574, at *3 (Tex. App.—Corpus Christi–Edinburg Apr. 5, 2018, pet. denied) (mem. op.). Rejecting that position as waived, the court of appeals affirmed, agreeing with Newfield that the Simmons Well did not trigger Addendum 18. *Id.*

After the Newfield appeal, the trial court returned to Rosetta's motion for summary judgment, inviting the Martins to submit additional briefing and to move for summary judgment regarding the effect of the Martin Well. The Martins filed a second amended petition and a motion for partial summary judgment, asserting that Rosetta's obligation to protect against drainage—including that caused by the Simmons Well—was triggered by the Martin Well. The trial court granted Rosetta's motion for summary judgment on all the Martins' claims and denied the Martins' motion.

The court of appeals reversed and remanded, instructing the trial court to grant partial summary judgment for the Martins. ___ S.W.3d ___, 2020 WL 5887566, at *6 (Tex. App.—Corpus Christi–Edinburg Oct. 1, 2020). Construing Addendum 18, the court concluded that the Martin Well triggered both a general duty to protect against drainage and a specific obligation to spud an offset well or release the undrilled acreage if, "in the opinions of reasonable and prudent operations, drainage is occurring on the un-drilled acreage." *Id.* at *5. The court of appeals also

5

concluded that the record showed drainage was indisputably occurring. *Id.* Additionally, because Rosetta and Newfield owned different interests and Rosetta's interests were not at issue during Newfield's summary judgment proceedings, the court of appeals rejected Rosetta's res judicata defense. *Id.*

Rosetta petitions for review, arguing that (1) Addendum 18 cannot be construed to allow separate triggering and draining wells, (2) the Martins' argument that the Martin Well triggered Addendum 18 is barred by res judicata, (3) the court of appeals erroneously concluded that drainage was not in dispute, and (4) the court erroneously reversed Rosetta's summary judgment as to all the Martins' claims when the Martins' appeal addressed only their claim for breach of contract. In response, the Martins argue that (1) the plain language of Addendum 18 allows for separate triggering and draining wells, (2) the court of appeals correctly concluded that the elements of res judicata were not met, (3) the summary judgment record includes production reports that establish drainage, and (4) in the alternative, Addendum 18 is ambiguous.

## ANALYSIS

I. **Addendum 18 is ambiguous regarding whether the Martin Well triggered Rosetta's obligation to protect against drainage from the Simmons Well.**

A. **Standard of review and applicable law**

We review summary judgments de novo. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). To prevail on a motion for traditional summary judgment, the movant must show that no

6

material fact issues exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). "When both parties move for summary judgment and the trial court grants one motion and denies the other, . . . we review both sides' summary judgment evidence and render the judgment the trial court should have rendered." *S. Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013).

Mineral leases are contracts, so their meaning is determined using general principles of contract construction. *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 147–48 (Tex. 2020). The goal of contract construction is to ascertain the parties' intent as expressed in the language of the agreement. *Id.* at 148.

Whether a mineral lease is ambiguous is a question of law. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). An ambiguity exists when a contract's "meaning is uncertain and doubtful or it is reasonably susceptible to more than one interpretation." *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) (orig. proceeding). If there is "more than one reasonable interpretation" of the contractual language, then a fact issue arises regarding the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Parties' conflicting interpretations cannot alone create an ambiguity. *Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 904 (Tex. 2016). Even if parties agree that a contract is unambiguous and argue that the unambiguous language merely creates different results, we may independently conclude that the contract is ambiguous as a matter of law. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). "When a contract contains an

7

ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983); *see also J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

To determine whether a lease is ambiguous, we must consider its language as a whole in light of well-settled construction principles. *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020) (citing *URI*, 543 S.W.3d at 763). These principles include giving the language its plain, ordinary, generally accepted meaning, *URI*, 543 S.W.3d at 764, considering the context in which words are used, *id.*, avoiding constructions that render provisions meaningless, *Coker*, 650 S.W.2d at 393, and construing contract provisions together so as to give effect to the whole, *Citizens Nat'l Bank in Abilene v. Tex. & P. Ry. Co.*, 150 S.W.2d 1003, 1006 (Tex. 1941). We also avoid constructions of contract language that would lead to absurd results. *Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011) (per curiam). Extrinsic evidence cannot be used to create ambiguity within a contract, but it may be admitted if the court determines that the contract is ambiguous. *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017).

The Martins' claims for breach of contract rely largely on the plain language of the lease. The lease provision at issue, Addendum 18, is an express covenant to protect against drainage.[3] When oil and gas leases

---

[3] The Martins have also alleged that Rosetta breached an implied covenant to protect against drainage, but the parties' briefing in this Court does not separately address this allegation. Because we are remanding for further proceedings on the Martins' claim for breach of contract, the parties

8

do not expressly address drainage, a covenant to protect against both local and field-wide drainage is implied. *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567–68 (Tex. 1981). Parties often supersede this implied covenant with contractual language that imposes certain obligations on the lessee. *See Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 701 (Tex. 2008); 8 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS OIL AND GAS LAW: MANUAL OF TERMS 683 (2020). Such obligations commonly include the drilling of an offset well, the payment of offset royalties, or the release of acreage. *See* 8 MANUAL OF TERMS at 684–85. Breach of a covenant gives rise to liability for damages. *See Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989).

Though Addendum 18 is an express covenant to protect against drainage, it incorporates the "reasonable and prudent operat[or]" standard of care (RPO standard), which also applies to the implied covenant to protect against drainage.[4] A plaintiff must show two elements to establish breach of an implied covenant: "proof (1) of substantial drainage from the lessor's field, and (2) that a reasonably prudent operator would have acted to prevent the drainage." *Kerr–McGee Corp. v. Helton*, 133 S.W.3d 245, 253 (Tex. 2004), *abrogated on other grounds by Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268

---

are free to litigate the alleged implied covenant on remand if there is still a dispute regarding whether such a covenant exists or was breached.

[4] *See Amoco*, 622 S.W.2d at 567–68 (explaining that "the standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances").

S.W.3d 1 (Tex. 2008). A reasonably prudent operator would not act to prevent drainage unless there was a reasonable expectation of profit. *Clifton v. Koontz*, 325 S.W.2d 684, 695–96 (Tex. 1959).

Parties are free to draft novel contractual terms that produce results some may consider odd; a court's duty is to give effect to the parties' intent as expressed in the contract's language. *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 211 (Tex. 2019). From our review of available sources, it appears that Addendum 18 is an outlier among express covenants to protect against drainage. As the court of appeals noted, not only are the addendum's provisions unique, they "suffe[r] from both a lack of accuracy and a lack of clarity," including typographical and grammatical errors. 2020 WL 5887566, at *3. As a result, we caution that our construction of Addendum 18 in this opinion may not provide useful guidance for determining how covenants to protect against drainage typically function.

### B. Though Addendum 18 lacks a coherent structure and helpful punctuation, many of its substantive provisions are unambiguous.

The parties offer competing interpretations of Addendum 18, and we focus on its language to determine the reasonableness of those interpretations. *See Columbia Gas*, 940 S.W.2d at 589. To frame our discussion of the disputed terms, we begin by setting out the unambiguous portions of Addendum 18. When holding that a portion of a contract is ambiguous, an appellate court should explain as much of the contract's unambiguous meaning as possible regarding the disputed issue, which will assist the parties and trial court in framing the

10

remaining questions for the jury to resolve on remand. *Cf. J.M. Davidson, Inc.*, 128 S.W.3d at 229 ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."); *Columbia Gas*, 940 S.W.2d at 589 ("Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.").

For ease of reference, we have broken down Addendum 18's language into four parts: the Trigger (1)(a), Obligation (1)(b), Standard (2)(a), and Performance (2)(b) parts. Together, these parts unambiguously impose an obligation on Rosetta that is triggered under limited conditions and that uses an RPO standard to measure whether and when Rosetta must take certain actions to perform that obligation.

### 1. Trigger – part (1)(a)

Part (1)(a) lists various events that provide an initial condition for the covenant contained in parts (1)(b) and (2). Though the parties disagree about whether part (1)(a) limits part (1)(b), a question we address below, part (1)(a) at least defines a triggering event that marks the beginning of Rosetta's obligation: when a well is drilled in one of the specified locations.

Typically, express covenants to protect against drainage are triggered by drilling on adjoining or proximity-limited acreage. *See* 8 MANUAL OF TERMS at 683. But under this non-typical clause, three types of wells may serve as a trigger: a well "on [leased] acreage," a well drilled

11

"in a unit containing" leased acreage (thus including acreage pooled with leased acreage), or a well "on acreage adjoining" leased acreage.

Applying this language from part (1)(a) to undisputed facts in the summary judgment record, we conclude that the Simmons Well does not qualify as a triggering well because it is outside the lease and unit and is not located on adjoining acreage. *See Newfield*, 2018 WL 1633574, at *3–4. The Martin Well qualifies as a triggering well, however, because it is located on leased acreage and in a unit containing part of the leased acreage.

### 2. Obligation – part (1)(b)

Part (1)(b) contains the substance of Rosetta's promise to the Martins. This part explains what Rosetta is obligated to do: protect the lease's "un-drilled acreage" from drainage. Express covenants to protect against drainage commonly obligate the lessee to protect the entire lease, but Addendum 18 uniquely limits Rosetta's responsibility to the "un-drilled" portion of the Martin Lease, which the parties agree is the non-pooled southern portion. This limitation may impact how a reasonably prudent operator evaluates whether drainage is occurring. Addendum 18 does not otherwise define "drainage," and the parties dispute whether "drainage" is limited by part (1)(a). We address these issues below.

### 3. Standard – part (2)(a)

Compared to the broad "protect[ion]" Rosetta promised to provide in part (1)(b), part (2) contains a more specific set of instructions for when "drainage is occurring." In particular, part (2)(a) selects a

12

standard for measuring whether Rosetta must take action or risk breach: the reasonably prudent operator standard. Together, parts (2)(a) and (2)(b) provide that when a reasonably prudent operator would conclude drainage is occurring, it must take certain actions within a twelve-month period thereafter to avoid breaching the covenant.

As mentioned above, the common-law standard that governs an implied covenant to protect against drainage involves two elements: proof of substantial drainage and that a reasonably prudent operator would expect it to be profitable to take action to prevent such drainage. *See Kerr–McGee*, 133 S.W.3d at 253; *Clifton*, 325 S.W.2d at 695–96. Addendum 18's text indicates, however, that the parties did not adopt the common-law standard in its entirety by referring to reasonable and prudent operations.

Departing from the "substantial drainage" element of the standard, part (2)(a) requires a lessee to act only if, "in the opinions of reasonable and prudent operat[ors], *drainage is occurring* on the un-drilled acreage." (Emphasis added). Though "occurring" drainage provides a lower threshold than "substantial drainage," the addendum's use of "is occurring" signals that a reasonable opinion regarding actual drainage is required, not a showing of deemed drainage (an approach used in some express covenants). As to the second element of the standard, which requires that an operator act to prevent such drainage only if there is a reasonable expectation of profit, the parties do not address whether the language of part (2) is consistent with this

13

element.[5]  In other words, the parties have not offered any views on whether the reference to a reasonably prudent operator requires evidence that action would be profitable before Rosetta must take one of the actions specified in part (2)(b).  We likewise express no view on this question, and the parties may address it on remand if it proves necessary to do so.

### 4.    Performance – part (2)(b)

Part (2)(b) provides the actions that Rosetta must take once a reasonably prudent operator would form an opinion that drainage is occurring.  This part of the addendum addresses how Rosetta may avoid breach: by spudding an offset well in the twelve months after drainage occurs or releasing the undrilled acreage.  Departing from the implied covenant, which gives the lessee a variety of options to protect against field-wide drainage,[6] Addendum 18 gives Rosetta only two options.

Despite grammatical problems, scrivener's errors, and a dearth of helpful punctuation, most of Addendum 18's requirements are unambiguous.  The basic parts are there: Rosetta's obligation in

---

[5] *Cf. Bell v. Chesapeake Energy Corp.*, No. 04-18-00129-CV, 2019 WL 1139584, at *10 (Tex. App.—San Antonio Mar. 13, 2019, pet. denied) (mem. op.) (holding that because the "second element clearly refers back to the first," change to RPO drainage element—"deemed drainage" instead of "substantial drainage"—"logically negate[d] the requirement of proving economic benefit").

[6] "The duties of a reasonably prudent operator to protect from field-wide drainage may include (1) drilling replacement wells, (2) re-working existing wells, (3) drilling additional wells, (4) seeking field-wide regulatory action, (5) seeking Rule 37 exceptions from the Railroad Commission, (6) seeking voluntary unitization, and (7) seeking other available administrative relief." *Amoco*, 622 S.W.2d at 568.

14

part (1)(b) is triggered by a well drilled in one of the locations listed in part (1)(a), and the standard that applies to Rosetta in part (2)(a) informs whether it must take one of the specified actions in part (2)(b) to avoid breach. As we discuss below, however, the relationship between parts (1)(a) and (1)(b) is not clear.

### C. Addendum 18 is ambiguous because there are two reasonable interpretations regarding whether "drainage" in part (1)(b) is limited by part (1)(a).

Having outlined how the unambiguous portions of Addendum 18 function, we come to the heart of the parties' dispute: whether the "drainage" that part (1)(b) obligates Rosetta to protect against is limited to drainage from a well listed in part (1)(a). Rosetta and the Martins offer different interpretations of how parts (1)(a) and (1)(b) relate, and the prevailing interpretation will inform the outcome of the Martins' claim that Rosetta breached Addendum 18. For example, if Rosetta's obligation to protect against drainage in part (1)(b) extends to wells not listed in part (1)(a), and if the Martins can show that a reasonably prudent operator would have concluded the Simmons Well was draining the undrilled acreage and that Rosetta did not act as required by part (2)(b) within twelve months thereafter, then Rosetta breached the addendum. By contrast, if drainage in part (1)(b) may only come from a triggering well listed in part (1)(a), then Rosetta did not breach the addendum because it need not protect against alleged drainage from the Simmons Well. We consider each interpretation in turn to determine whether it is reasonable.

***First***, the Martins argue that "drainage" in part (1)(b) is not limited by part (1)(a). Under this interpretation, a part (1)(a) event—

15

the drilling of a qualifying well—would trigger Rosetta's obligation but not necessarily identify the source of the drainage. Thus, the drilling of the Martin well—which falls under part (1)(a)—would trigger Rosetta's obligation to protect against drainage of the "un-drilled acreage," and that obligation includes drainage from the Simmons Well even though it is not in a location listed in part (1)(a).

This interpretation is reasonable because neither part (1)(a) nor part (1)(b) contains express language limiting Rosetta's drainage-protection obligation to a well in part (1)(a). Rather, the word "drainage" in (1)(b) is used without direct modification.

If the original parties to the addendum had wanted to obligate the lessee to protect only against drainage from wells identified in part (1)(a), they could easily have done so. Parties commonly trigger the obligation to drill an offset well by identifying the location of a draining well, not merely a triggering well. *See* 4 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS OIL AND GAS LAW § 671.3 (2020). In fact, Paragraph 5—the parties' previous, and superseded, express covenant—did just that. Paragraph 5 provided that "[i]n the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within 330 feet of *and draining* the leased premises, or land pooled therewith, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances." (Emphasis added). Paragraph 5 thus expressly requires that the triggering well be a draining well. The language of Addendum 18 is different: it expressly negates the 330-foot limit, expands where the triggering well can be located to include the leased

16

premises and land pooled therewith, and deletes the requirements that the triggering well produce in paying quantities and drain the leased premises or land pooled therewith. It would be reasonable to conclude that Addendum 18 should not be read to contain language from Paragraph 5 that the parties agreed to change.

In addition, it would be reasonable to conclude that the parties intended the drilling of a well under part (1)(a) to signal that the lessee's obligation had begun, but not necessarily that drainage was occurring. Rosetta asks why "anyone in the Martins' shoes"—i.e., desiring general "protection from drainage to the south and southwest"—would "condition that protection on whether an entirely separate, non-draining well happened to have already been drilled elsewhere on their unit?" Perhaps the parties chose this limitation because until a well is drilled on the lease or unit, the lessee is more likely to be unaware of the threat of drainage from wells not adjoining the lease. Once the lessee has a well operating on the lease or unit, however, it is easier for it to notice such drainage.

Further support for the conclusion that the triggering and draining wells need not be the same comes from the parties' decision to allow a triggering well to be "on . . . the leased acreage," including the non-unitized southern portion of the Martin Lease. A triggering well on this "un-drilled acreage" could not drain itself, which suggests that the parties contemplated the possibility of separate triggering and draining wells.

Ultimately, under the Martins' interpretation, the covenant begins with the drilling of a well under part (1)(a) but is not breached

17

until an RPO would conclude drainage is occurring under part (2)(a) and the lessee fails to take action under part (2)(b).[7] We conclude that such an interpretation is reasonable.

***Second***, Rosetta argues that "drainage" must come from a well identified in part (1)(a). Under this interpretation, a part (1)(a) event—the drilling of a qualifying well—would both trigger Rosetta's obligation and identify the source of the drainage against which it must protect. Here, Rosetta's obligation to protect against drainage from the Simmons Well would not have arisen because that well does not fall under part (1)(a).

This interpretation is also reasonable because Addendum 18 could be read to suggest that part (1)(b) is restricted by both parts (1)(a) and (2)(a). Because part (1)(a) is a conditional clause, the drilling of a qualifying well must occur before part (1)(b), the main clause, goes into effect. It would be reasonable to conclude that the conditional clause informs the scope of the main clause, especially if it does not conflict with subsequent limiting language. As Rosetta argues, part (1)(a)

---

[7] If, on remand, the finder of fact agrees with the Martins' interpretation of Addendum 18, it may need to resolve additional fact issues regarding parts (2)(a) and (2)(b). For example, as the record presently stands, the Martins have not proven conclusively under part (2)(a) that a reasonably prudent operator would have formed the opinion that drainage was occurring. And under part (2)(b), the Martins have not proven conclusively that Rosetta failed to drill such a well within twelve months thereafter. The record includes production logs for the Martin Well showing a decrease after the Simmons Well was drilled. But this evidence does not address other possible causes, or when a reasonably prudent operator would have formed the opinion that drainage was occurring.

18

references only a single "event" and "well." If part (1)(a) provides the condition under which Rosetta must protect against drainage, then that single event and well could reasonably be read to inform the scope of the obligation.

Interpreting part (1)(a) to provide a list of possible draining wells would not produce absurd results. It may seem counterintuitive, at first glance, to mandate protection against drainage from wells drilled on leased property, but parties may agree to prevent "internal drainage" where some lease acreage is unitized with non-lease acreage. *See* 4 WILLIAMS & MEYERS § 669.16. Here, because Rosetta's obligation is limited to drainage of the "un-drilled acreage," it would have been reasonable for the parties to include wells located on leased acreage in part (1)(a)—such as the Martin Well—because wells on the Martin Unit may have paid a smaller royalty.

Additionally, Rosetta's reading would not create conflict between the sections of Addendum 18 that inform "drainage"—parts (1)(a) and (2)(a). Part (2)(a) tells us that a draining well under Addendum 18 is not defined by its distance from a particular area, as it was under the original Paragraph 5. But that is not to say that part (2)(a) does away with all proximity restrictions; the distance from which a reasonably prudent operator would conclude drainage is occurring is necessarily limited. And because part (1)(a)—under Rosetta's reading—would create a more restrictive limit on the location of draining wells, there is no conflict between the two provisions. Ultimately, it would be reasonable to conclude that the parties created a two-step system under which part (1)(a) describes a limited class of draining wells and the RPO

19

standard provides a second check before the lessee would need to act on its obligation.[8]

Because we conclude that both interpretations are reasonable, a fact issue exists and summary judgment for any party was improper on the merits of the Martins' claim that Rosetta breached Addendum 18.

## II. Res judicata does not bar the Martins' argument that drilling the Martin Well triggered an obligation to prevent drainage from the Simmons Well.

Rosetta argues that it is nonetheless entitled to summary judgment on the Martins' claim of breach because it conclusively proved its affirmative defense of res judicata. In Rosetta's view, the Martins' argument that the Martin Well triggered Rosetta's duty to protect against drainage from the Simmons Well is barred because it could have

---

[8] If, on remand, the finder of fact agrees with Rosetta about the relationship between parts (1)(a) and (1)(b), then it may need to resolve a sub-ambiguity: whether Addendum 18 contains two separate obligations. The court of appeals construed Addendum 18 to contain two duties, one that requires the lessee to protect against drainage and another that requires spudding an offset well or releasing the acreage if an RPO concludes drainage is occurring. Under this two-duty construction, the first duty—contained in part (1)(b)—would obligate the lessee to protect against drainage only from wells identified in part (1)(a) but would arguably give the lessee the full range of options to protect against drainage under the implied covenant. By contrast, the second duty—contained in part (2)—would apply to any well from which an RPO would conclude drainage was occurring but would limit the lessee's options for compliance. This two-duty construction is not reasonable if part (1)(a) serves the function that the Martins' interpretation suggests. If the Martins are correct that part (1)(a) does not necessarily limit the source of drainage, then neither duty could be triggered without the other. But if Rosetta is correct that part (1)(a) describes the source of drainage from which it "shall protect" under part (1)(b), it may be necessary to determine whether part (2) contains a duty apart from that contained in part (1).

20

been raised against Newfield in the trial court, but the court of appeals in *Newfield* held that it had not been preserved. We disagree for two reasons: res judicata does not apply between separate actions created by a trial-court severance, and Rosetta's challenge is to a new *argument* raised by the Martins, not a new claim.

The doctrine of res judicata, or claim preclusion, bars causes of action that have already been fully adjudicated or that, with the use of diligence, could have been brought in the prior suit. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021); *Barr v. Resol. Tr. Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 628 (Tex. 1992). Res judicata requires proof of three elements: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996); *see also* 18A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4404 (2d ed. 2002) ("Res judicata applies as between separate actions, not within the confines of a single action on trial or appeal."). Parties may be in privity if (1) they "control an action," (2) "their interests can be represented by a party to the action," or (3) they are "successors in interest." *Amstadt*, 919 S.W.2d at 653.

Though the severance of Newfield's summary judgment created a second action, *see Hall v. City of Austin*, 450 S.W.2d 836, 837–38 (Tex. 1970), and the Martins' attempt to raise the argument was unsuccessful in *Newfield*, claim preclusion does not apply for two independent reasons.

21

First, this case began as a single action against both Rosetta and Newfield, and the Martins' claims against Rosetta were raised in that action. We have recognized—as a "logical corollary" to the general rule—that "the res judicata effects of an action cannot preclude litigation of claims that a trial court explicitly separates or severs from that action." *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985) (holding that, where trial court granted separate trials for intervention claim and malpractice counterclaim, judgment in first action did not have a res judicata effect on second); *Morrison v. St. Anthony Hotel*, 295 S.W.2d 246, 249 (Tex. App.—San Antonio 1956, writ ref'd n.r.e.) (concluding that prior severed appeal was not res judicata because third party was not part of appeal); *see also Law Offices of Robert D. Wilson v. Tex. Univest-Frisco, Ltd.*, 291 S.W.3d 110, 114 (Tex. App.—Dallas 2009, no pet.) ("The actions taken in the initial suit had no effect on the new cause, which had been severed by the trial court.").

Indeed, the reasons why a severance was permissible here confirm that the elements of res judicata are not met. One reason is that Newfield and Rosetta are not in privity. Neither Rosetta nor Newfield controlled the other, neither succeeded in interest from the other, and neither held the same interests with respect to the Martin Lease or Martin Unit. The Martins' claims against each party were also somewhat different, as Rosetta alone held a leasehold interest in the non-unitized southern portion of the Martin Lease. In addition, Rosetta was not a party to the *Newfield* appeal and the claims against it were not fully adjudicated. *See Morrison*, 295 S.W.2d at 249.

22

Second, and independently, Rosetta's res judicata defense fails because Rosetta does not seek to preclude the Martins' *claim*, but rather an issue the Martins have raised in support of that claim. Res judicata applies to claims, not issues. The basic nature of the Martins' claim that Rosetta and Newfield breached Addendum 18 has not changed; the Martins simply added a new argument (with the trial court's permission) regarding why Addendum 18 was triggered. *See Barr*, 837 S.W.2d at 628–29 (differentiating between issue and claim preclusion and concluding that alleged failure to bring "all theories of liability in one suit" constituted defense of claim preclusion).

For these reasons, Rosetta is not entitled to a take-nothing judgment on the Martins' claim of breach based on res judicata.

## III. The court of appeals erred by reversing Rosetta's summary judgment as to the Martins' tort and statutory claims.

Finally, Rosetta argues that the court of appeals erroneously reversed its entire summary judgment because the Martins failed to challenge Rosetta's independent grounds for granting summary judgment on the Martins' tort and statutory claims. We agree. Rosetta sought summary judgment on the Martins' tort claims under the economic-loss rule and on their Theft Liability Act claim on the ground that Rosetta did not benefit from the Simmons Well. The Martins did not challenge either ground on appeal.

An appellate court may not reverse a trial court's judgment without properly assigned error. *Cent. Educ. Agency v. Burke*, 711 S.W.2d 7, 8 (Tex. 1986) (per curiam). When a trial court's order granting summary judgment does not specify the grounds on which its order is

23

based, the appealing party must negate each ground upon which the judgment could have been based. *Malooly Bros. v. Napier*, 461 S.W.2d 119, 120–21 (Tex. 1970); *Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 313 (Tex. App.—Dallas 2009, pet. denied).

A party may negate each ground by raising separate issues "or asserting a general issue that the trial court erred in granting summary judgment and within that issue providing argument negating all possible grounds upon which summary judgment could have been granted." *Jarvis*, 298 S.W.3d at 313; *Tweedell v. Hochheim Prairie Farm Mut. Ins. Ass'n*, 1 S.W.3d 304, 309 (Tex. App.—Corpus Christi–Edinburg 1999, no pet.) (affirming trial court's summary judgment on grounds not challenged "(1) by a separate [issue] or (2) by argument and citation to authority under" a broader issue).

A general statement that "the trial court erred by granting [the movant's] motion for summary judgment" may be sufficient to allow argument on all possible grounds that the summary judgment motion was granted, *Plexchem Int'l, Inc. v. Harris Cnty. Appraisal Dist.*, 922 S.W.2d 930, 931 (Tex. 1996) (per curiam), but if a party does not brief those arguments to the court of appeals, the court of appeals cannot properly reverse summary judgment on those grounds. *Malooly Bros.*, 461 S.W.2d at 121; *see also* TEX. R. APP. P. 38.1(i) ("The [appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

Applying these principles here, we examine the Martins' causes of action, the grounds on which Rosetta moved for summary judgment, and whether the Martins attacked each of those grounds in their

court-of-appeals briefing. These sources show that the court of appeals erroneously reversed Rosetta's summary judgment as to the Martins' tort and statutory claims.

In their second amended petition, the Martins alleged a breach-of-contract cause of action and several tort causes of action, including common-law fraud, negligence, negligent misrepresentation, conversion, mineral trespass, breach of fiduciary duty, and fraudulent concealment. They also alleged a statutory claim for violation of the Theft Liability Act.

In its motion for summary judgment, Rosetta challenged all these claims. On the tort claims, Rosetta first argued that each of the Martins' tort claims were barred by the economic loss rule. Rosetta then argued, in the alternative, that the Martins' tort claims failed because no duty existed in contract. Then, as to the Theft Liability Act claim and some of the other claims, Rosetta argued that they failed as a matter of law because it obtained no benefit from the Simmons Well, which was the alleged draining well. Without identifying specific grounds, the trial court granted summary judgment for Rosetta on all the Martins' claims.

We conclude that Rosetta's economic-loss-rule and no-benefit grounds for summary judgment were independent of its breach-of-contract grounds, and thus the Martins needed to challenge those grounds separately in the court of appeals. To determine whether a plaintiff's tort claim sounds in contract under the economic loss rule, we look at whether the loss is to "the subject of the contract." *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 242 (Tex. 2014); *see also Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). This

25

is a separate inquiry from whether Rosetta can defeat the Martins' claim for breach of contract. Similarly, whether Rosetta benefited from the Simmons Well is a separate inquiry.

In their court-of-appeals briefing, the Martins' substantive arguments related only to Rosetta's contractual obligations under Addendum 18. There were no citations or authorities related to their tort or statutory causes of action or to Rosetta's economic-loss-rule defense. At most, the Martins make broad statements challenging the sufficiency of Rosetta's summary judgment evidence, such as "Rosetta did not show that they are entitled to a judgment as a matter of law." Such a statement is not sufficient to challenge Rosetta's economic-loss-rule ground for summary judgment on the tort claims or its no-benefit ground for summary judgment on the Theft Liability Act claim. *See Jarvis*, 298 S.W.3d at 313.

Because the Martins did not challenge each independent ground on which the trial court could have based its summary judgment on the tort and statutory claims, the trial court's take-nothing judgment on those claims should stand. The court of appeals improperly reversed the trial court's judgment in its entirety.

### Conclusion

For these reasons, we hold that Addendum 18 is ambiguous regarding whether the source of "drainage" in part (1)(b) is limited to the well locations listed in part (1)(a). Therefore, a fact issue remains on the Martins' claim for breach of the lease, and summary judgment is not proper for either party. We also hold that the Martins' argument that drilling the Martin Well triggered Rosetta's obligation to prevent

26

drainage from the Simmons Well is not barred by res judicata. But the court of appeals erred by reversing the take-nothing summary judgment as to the Martins' tort and statutory claims. We therefore reverse the court of appeals' judgment, reinstate the trial court's summary judgment in part as to the Martins' tort and statutory claims, and remand for further proceedings on the Martins' claim for breach of contract.

 

J. Brett Busby
Justice

**OPINION DELIVERED:** May 6, 2022

27